UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Joyce Johnson,                                          No. 24-cv-2602 (KMM/EMB)

        Plaintiff,

v.

Landlord Resource Network,

        Defendant.

---

Benjamin Prigge,                                        No. 24-cv-3328 (KMM/EMB)

        Plaintiff,

v.

Landlord Resource Network,

        Defendant.

---

Kimberly Heins,                                         No. 24-cv-4105 (KMM/EMB)

        Plaintiff,

v.

Landlord Resource Network,

        Defendant.

---

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

---

Defendant Landlord Resource Network ("LRN") is a law firm that provides services

to landlords. LRN commenced separate eviction actions in Minnesota state court on behalf

of three of its landlord clients against Plaintiffs Joyce Johnson, Benjamin Prigge, and Kimberly Heins. After the parties resolved the eviction cases, Ms. Johnson, Mr. Prigge, and Ms. Heins filed actions in this Court alleging that LRN violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). Though each FDCPA case retains its separate character, the Court has managed them as related cases given the similarity of the Plaintiffs' claims and LRN's defenses across all three. Plaintiffs allege that in the state court eviction complaints, LRN misrepresented the amount of the debt owed by the Plaintiffs and attempted to collect amounts that were not authorized by the relevant contracts or that were prohibited by law. *See* 15 U.S.C. §§ 1692e, 1692e(2), 1692e(10), 1692f(1). The parties have filed cross-motions for summary judgment. For the reasons that follow, LRN's motions are granted, Plaintiffs' motions are denied, and these cases are dismissed with prejudice.

## BACKGROUND

### *Joyce Johnson*

Ms. Johnson is 75 years old, lives in Olmsted County, and works for an insurance agency. *Johnson*, Dkt. 53 ("First Johnson Decl.") ¶¶ 1–2. Between October 2019 and February 2024, Ms. Johnson rented an apartment at the Northgate Apartments complex in Rochester. First Johnson Decl. ¶ 3. Rochester New Hope Corporation ("RNHC") owns Northgate Apartments and acted as Ms. Johnson's landlord. *Johnson*, Dkt. 88 ("*Johnson* Brine Decl.") ¶¶ 9–10, Ex. A. Ms. Johnson's apartment unit was federally subsidized, meaning that the U.S. Department of Housing and Urban Development ("HUD") paid a portion of her rent each month directly to RNHC, and Ms. Johnson was responsible for the

remaining balance. First Johnson Decl. ¶ 5. At some point in 2021, RNHC informed Ms. Johnson that HUD made an overpayment on her behalf of $796, RNHC was required to reimburse HUD that amount, and Ms. Johnson would have to repay RNHC for the reimbursed sums. *Id.* ¶ 6; *Johnson*, Dkt. 1 ¶¶ 12–13. On September 23, 2021, Ms. Johnson and RNHC entered into a "Repayment Agreement" that required Johnson to pay RNHC $50 per month for 15 months followed by a final payment of $46 in addition to her regular share of the monthly rent. First Johnson Decl. ¶ 7, Ex. A; *Johnson* Brine Decl. ¶¶ 14–15, Ex. B. These additional payments were to commence on November 1, 2021. *Johnson* Brine Decl., Ex. B.

However, in addition to charging Ms. Johnson the extra $50 amount, on December 31, 2022, RNHC charged her a lump sum of $796. First Johnson Decl. ¶ 8, Ex. B at 2. On May 10, 2023, RNHC's property manager for the Northgate Apartments, Nath Companies, sent Ms. Johnson a Notice of Lease Termination stating that she owed $801, and although Ms. Johnson did not understand how RNHC calculated that amount, she thought it consisted of the erroneous $796 charge from December 31, 2022 as well as a $5 late fee. *Id.* ¶ 9, Ex. C. Ms. Johnson attempted to pay her rent for May 2023, but RNHC refused to accept it because it did not include the $801 charge that would settle her balance. *Id.* ¶ 10. RNHC also refused to accept her rent payments for June and July 2023 because of the balance on her ledger. *Id.* ¶ 11. It is undisputed that the second charge of $796 was erroneous and Ms. Johnson had been paying off what she owed under the Repayment Agreement each month. What she still owed to reimburse RNHC for the HUD overpayment in December 2022 was far less than $796.

On June 28, 2023, RNHC retained LRN to initiate an eviction action against Ms. Johnson. *Johnson* Brine Decl. ¶ 16. RNHC told LRN that Ms. Johnson failed to repay the amounts she owed under the Repayment Agreement. *Id.* ¶ 18.[1] LRN attorney Bridget Brine reviewed the information received from RNHC, including its ledger for Ms. Johnson's tenancy. *Id.* ¶ 22. Ms. Brine then asked for confirmation that Ms. Johnson failed to make those payments, and RNHC confirmed that she had. *Id.* ¶ 20. According to Ms. Brine, at the time the Eviction Action Complaint was filed, she had no reason to believe that the amounts stated in the pleading were inaccurate. *Id.* ¶ 24.

LRN served the Eviction Action Complaint on Ms. Johnson in July 2023, asserting that Ms. Johnson owed RNHC $1,827.00. First Johnson Decl. ¶ 13. This consisted of $780 in unpaid rent for May, June, and July 2023; $587 in unpaid installments under the Repayment Agreement for May 2021 through October 2021; and $460 in court filing fees, legal process and service fees, and attorney fees. *Id.* ¶ 14, Ex. E ¶ 5. However, by the time the eviction action was filed, Ms. Johnson had in fact fully repaid what she owed under the Repayment Agreement. First Johnson Decl. ¶¶ 15–16. Ms. Johnson was confused by the eviction action's claims because she had paid all she owed under the Repayment Agreement, and she was concerned that she could become homeless. *Johnson*, Dkt. 97 ("Second Johnson Decl.") ¶¶ 5, 13.

---

[1] In the *Johnson* matter, the 16th through 23rd paragraphs of Ms. Brine's declaration are mistakenly numbered 1 through 7. The Court refers to these paragraphs by the numbers they should bear if the numbering had been sequential.

After Ms. Brine filed the eviction action against Ms. Johnson, Ms. Brine again confirmed with RNHC that Ms. Johnson had an outstanding balance. Brine Decl. ¶ 25. But in late August 2023, RNHC informed Ms. Brine that Ms. Johnson had actually satisfied her obligations under the Repayment Agreement as of April 1, 2022 more than a year before. *Id.* ¶¶ 27, 33.

When Ms. Johnson received the Eviction Action Complaint, she was not represented by counsel. *Johnson*, Dkt. 96 ("*Johnson* Buhta Decl.") ¶¶ 9, 11. Southern Minnesota Regional Legal Services, Inc. ("SMRLS") attorney John Buhta met with Ms. Johnson on August 14, 2023, the date a hearing in the eviction action was originally scheduled, and Mr. Buhta agreed to represent her in the eviction action. *Id.* ¶¶ 17–18; Second Johnson Decl. ¶ 7. At no point during the eviction action proceedings did Ms. Brine or any other representative from LRN have any direct communication with Ms. Johnson. *Johnson* Brine Decl. ¶ 38.

On August 28, 2023, the Olmsted County court held a remote hearing. *Johnson* Brine Decl. ¶ 31. During a break-out session for the attorneys, Ms. Brine and Mr. Buhta discussed the ledgers for Ms. Johnson's account. Ms. Brine explained that RNHC's parent company audited the statements from the property manager and determined that the property manager continued to bill Ms. Johnson under the Repayment Agreement after she had paid everything she owed under that contract. *Id.* ¶ 32. The parties eventually reached a settlement agreement in which Ms. Johnson agreed to pay $1,240 for the past due balance and $260 for September 2023 rent, while RNHC agreed to waive court costs. *Id.* Ms. Johnson would not agree to waive her FDCPA rights as part of the settlement

agreement. Second Johnson Decl. ¶ 17. On September 19, 2023, the parties submitted their settlement agreement to the Olmsted County court as a stipulation for the entry of an order, and the court entered the Stipulation and Order that same day. *Johnson* Brine Decl. ¶ 35, Ex. J.

### Benjamin Prigge

Mr. Prigge is 33 years old, lives in Olmsted County, and currently works part-time at Valvoline. *Prigge*, Dkt. 49 ("First Prigge Decl.") ¶¶ 1–2. From February 2020 through June 2023, Mr. Prigge rented a unit in the Eastgate Apartments complex in Rochester. *Id.* ¶ 4; *see also Prigge*, Dkt. 83 ("Keller Decl.") ¶ 8. BDKN, LLLP ("BDKN") owns the Eastgate Apartments complex and Real Estate Equities LLC ("REE") is the property manager. Keller Decl. ¶¶ 2–3. While Mr. Prigge lived at Eastgate Apartments, he participated in the Housing Choice (Section 8) Voucher program, meaning that a portion of his rent was paid by the Olmsted County Housing and Redevelopment Authority. First Prigge Decl. ¶ 5.

In May 2023, Mr. Prigge paid his portion of the rent in the amount of $840. First Prigge Decl. ¶ 6. However, the landlord did not receive Mr. Prigge's rent payment in June 2023. *Id.* ¶ 6; *see also* Keller Decl. ¶ 10.[2] On July 21, 2023, REE retained LRN to initiate

---

[2] Mr. Prigge states "there was an issue with my [June 2023] rent payment that I believe was caused by the online payment system that my landlord used." First Prigge Decl. ¶ 6. Amy Keller, a Property Manager Coordinator for REE, states "Mr. Prigge ultimately failed to make the required Lease payments, resulting in a default" under the lease. Keller Decl. ¶ 10. These declarations reflect at least some level of dispute about whether Mr. Prigge attempted to make his rent payment for June 2023, but this dispute is not material to any issue before the Court relating to Mr. Prigge's claims under the FDCPA.

an eviction action against Mr. Prigge in Olmsted County court. Keller Decl. ¶ 11; *Prigge*, Dkt. 81 ("Hage Decl.") ¶ 24. Attorney Brian Hage, LRN's founder, prepared an eviction complaint regarding Mr. Prigge's tenancy after reviewing ledgers from BDKN. Hage Decl. ¶ 25. Mr. Prigge states that his landlord sent him a letter in June 2023 telling him that he had seven days to pay his June rent or leave the apartment, "so [he] moved out of Eastgate apartments in June 2023." First Prigge Decl. ¶ 6. According to Mr. Prigge, he turned in his keys to the apartment unit when he moved out in June 2023. *Id.* ¶ 17. However, as noted below, LRN disputes that the landlord received the keys to the apartment at that time.

Although Mr. Prigge moved out in June, Mr. Hage filed the Eviction Action Complaint against Prigge in Olmsted County court on July 21, 2023. Keller Decl., Ex. B. The eviction complaint alleges that Mr. Prigge was in arrears $2,953.92, including $2,463.92 for unpaid rent and late fees for May, June, and July 2023; an additional $30 in "NSF Fees"; and $460 in court filing fees, legal process and service fees, and attorney fees. *Id.*, Ex. B ¶ 5.

Mr. Prigge learned that the eviction action had been filed against him in July 2023, which confused him because he had already moved out of the apartment and had already paid rent for May 2023. First Prigge Decl. ¶¶ 9, 10. Mr. Prigge met with SMRLS attorney Christopher Coon on August 21, 2023, and Mr. Coon reviewed a copy of the ledger for Prigge's tenancy. *Id.* ¶ 11; *Prigge*, Dkt. 93 ("*Prigge* Buhta Decl.") 18. Two entries in the ledger, both dated May 1, 2023, indicate separate charges of $187.00. First Prigge Decl., Ex. B at 4. One of these entries indicates that it is for "Assisted Rent (voucher) (05/2023)" and the other states "Correction- Rent amount increased to $1,045.00 as of 05/01/2023."

*Id.* The ledger also reflects two similarly coded entries for $187.00 each on June 1, 2023. *Id.*

Mr. Prigge states that the $187 entries in May and June 2023 are "improper duplicate charges." First Prigge Decl. ¶ 11. According to Amy Keller of REE, however, the content of the Eviction Action Complaint regarding the amounts allegedly owed by Mr. Prigge is accurate. Keller Decl. ¶¶ 14, 17. Ms. Keller also states that review of the account after Mr. Prigge vacated the apartment identified "no irregularities or inaccuracies." *Id.* ¶ 22. REE has sent the entire ledger balance to a collection agency, Rent Recovery Solutions ("RRS"). *Id.* According to Ms. Keller, Mr. Prigge has not disputed the $187 charges in the RRS collection efforts. *Id.* ¶ 23. Mr. Prigge appears to disagree and states that he continues to dispute the accuracy of those charges. *Prigge*, Dkt. 94 ("Second Prigge Decl.") ¶ 10. LRN has been unable to identify any issues with the accuracy of the information it received with respect to Mr. Prigge's tenancy. Hage Decl. ¶ 38.

The Olmsted County district court held a hearing in the eviction action on August 21, 2023. Hage Decl. ¶ 30. LRN attorney Clarice Scarnecchia appeared for BDKN and SMRLS attorney John Buhta appeared for Mr. Prigge. *Id.* Mr. Hage states that on August 21, REE confirmed for LRN that Mr. Prigge vacated the unit, and "LRN was informed that Mr. Prigge would be returning the keys . . . ." *Id.* ¶¶ 31, 33. LRN then dismissed the eviction action. *Id.* ¶¶ 35–36.

Mr. Prigge also asserts that the ledger contains inaccurate or incorrect charges beyond the alleged duplicate $187 charges from May and June 2023. Second Prigge Decl. ¶ 9 (referring to pages 91–93 of Mr. Prigge's deposition). Mr. Prigge disputes the propriety

of charges in his ledger concerning his cat because it is an emotional support animal. *Prigge*, Dkt. 82-1 ("Prigge Dep.") 91–92. He also objects to any late charges that he received from 2020 through May 2023. Prigge Dep. 92.

### Kimberly Heins

Ms. Heins is 41 years old and lives in Olmsted County. *Heins*, Dkt. 42 ("First Heins Decl.") ¶¶ 1–2. She is a single mother and works for Mayo Clinic. *Id.* From March 2023 through April 2024, she and her teenage daughter lived in the French Creek Townhomes in Rochester. *Id.* ¶ 4; *Heins*, Dkt. 78 ("DiMarco Decl.") ¶¶ 11–12, Ex. A. Monarch Investment and Management Group, LLC ("MIMG") owns[3] and manages the French Creek Townhomes and was the landlord for Ms. Heins' lease. DiMarco Decl. ¶¶ 3–6. Ms. Heins paid her landlord several fees in connection with obtaining the lease, including: an "Application Fee"; "Convenience Fee"; "Move in Admin Fee"; "Credit Approval Fee"; "Renters Insurance Waiver Fee"; "Utility Billing Service Fee"; "Utility Billing – Setup Fee"; and "Utility Billing – Trash" fee. First Heins Decl. ¶ 5. Her monthly rent was $1,550. *Id.*

In August 2023, Ms. Heins "got behind on rent because [she] couldn't work while [she] was taking care of [her] critically-ill mother." First Heins Decl. ¶ 6. According to

---

[3] The MIMG entity that owns the French Creek Townhomes is apparently MIMG CLXXV French Creek Sub, LLC, whereas MIMG is the property manager for that complex. DiMarco Decl. ¶ 5. There is no information about the specific relationship between MIMG and MIMG CLXXV French Creek Sub, LLC, but LRN's filings use the abbreviation MIMG to refer to both entities. *Compare* DiMarco Decl. ¶ 2, *with Heins*, Dkt. 75 ("*Heins* Brine Decl.") ¶ 7. The specific relationship between the two entities is immaterial to the claims and defenses currently at issue in this litigation.

Dave DiMarco, an MIMG Asset Manager, "Ms. Heins ultimately failed to make required Lease payments, resulting in a default" under the lease. DiMarco Decl. ¶ 13. Ms. Heins does not deny that she failed to make all her required rental payments.[4]

On October 23, 2023, MIMG retained LRN to initiate an eviction action against Ms. Heins in Olmsted County. DiMarco Decl. ¶ 14; *Heins* Brine Decl. ¶ 14. LRN attorney Clarice Scarnecchia prepared and filed an eviction complaint against Ms. Heins that same day in Olmsted County district court. *Heins* Brine Decl. ¶ 15. LRN attorney Bridge Brine reviewed the eviction complaint against Ms. Heins and determined that it complied with LRN's policies and procedures and was accurate. *Id.* ¶ 17. Ms. Brine states that at the time the eviction complaint was filed, she "had no reason to believe that the amounts stated therein, or its attached ledger, were inaccurate, incorrect, or impermissible." *Id.* ¶ 18. Further, she states that she does not now have any reason to believe the arrearage identified was inaccurate. *Id.*

Ms. Heins was served with the eviction action complaint in October 2023. First Heins Decl. ¶ 7, Ex. A; *Heins*, Dkt. 87 ("*Heins* Buhta Decl.") ¶ 8. The eviction complaint alleges that Ms. Heins was in arrears $4,130.32 for unpaid rent from August 2023 through October 2023, and that she owed $460 in court filing fees, legal process and service fees, and attorney fees. First Heins Decl., Ex. A ¶ 5. The ledger for Ms. Heins' tenancy includes the following relevant charges: (1) a $50 application fee (March 19, 2023); (2) a $63

---

[4] The ledger for Ms. Heins' account shows no payment for rent in August, September, or October 2023. First Heins Decl., Ex. A at 4.

convenience fee (March 29, 2023); (3) a $100 move in admin fee (March 29, 2023); (4) a
$300 credit approval fee (March 29, 2023); (5) a $12 renters insurance waiver fee each
month beginning May 1, 2023; (6) a $5 utility billing service fee each month beginning
June 1, 2023; and (7) a variable utility billing trash fee each month beginning April 1, 2023.
*Id.*, Ex. A at 4.[5]

When she was served with the eviction complaint, Ms. Heins did not have an
attorney. *Heins* Buhta Decl. ¶ 9. When she reviewed the eviction complaint, she was
confused because the amount LRN claimed she owed did not make sense to her. First Heins
Decl. ¶ 9. She saw that there were two ledgers attached to the complaint, and one of them
appeared to have been created for the purposes of the eviction case and was missing some
of the charges that were on the other ledger. *Id.* (citing First Heins Decl., Ex. A at 4–6).
Ms. Brine states that the fees at issue were part of a separate agreement between Ms. Heins
and French Creek Townhomes. *Heins* Brine Decl. ¶ 19. The Deposit and Fee Structure
Policy indicates that Ms. Heins agreed to pay a $300 Credit Approval Fee; a $50
application fee; a $100 Administrative fee; a $12 fee if she elected not to obtain renters
insurance; and specified utility fees. *Id.*, Ex. C.[6] Ms. Brine states that LRN did not seek to
collect any application fee, move-in admin fee, or credit approval fee on behalf of MIMG
in the eviction action and that "Ms. Heins agreed to pay (and did pay) these amounts prior

---

[5] Ms. Heins' lease provides that gas and trash utilities were billed on an allocation
based on the number of persons residing in the apartment using a ratio occupancy formula.
First Heins Decl., Ex. A at 28–29.

[6] Ms. Heins electronically signed the agreement on March 19, 2023. *Heins* Brine
Decl., Ex. C at 4–5.

to becoming a tenant at French Creek Townhomes." *Id.* ¶ 19. She states that "[n]on-payment of those sums was not a basis for the Eviction Action." *Id.* ¶ 21; *see also* DiMarco Decl. ¶¶ 26–28, Ex. C.

A remote hearing was scheduled in the eviction action for November 6, 2023. *Heins* Brine Decl., Ex. D; *Heins* Buhta Decl. ¶ 17. That day, Ms. Heins met with attorney John Buhta from SMRLS and he agreed to represent her in the eviction action. *Heins* Buhta Decl. ¶ 18. Mr. Buhta states that the complaint against Ms. Heins and the attached ledgers were (and continue to be) confusing and misleading. *Id.* ¶¶ 12–13.

At the time of the hearing in Ms. Heins' case, there was pending litigation in Olmsted County District Court involving her landlord and other related entities alleging certain charges being imposed on tenants in violation of Minnesota law. *Id.* ¶ 21. In November 2022, the Olmsted County Court entered an Order enforcing a settlement agreement in that litigation ("the Olmstead Court Order"). *Id.* ¶ 22, Ex. C. The Olmstead Court Order enumerated certain charges that MIMG could require tenants to pay, and it prohibited MIMG from filing eviction actions for any tenant's failure to pay any other charges. *Id.* ¶ 22. According to Mr. Buhta, the only charges the landlord was permitted to collect and then pursue through an eviction action were: base rent, parking fees, pet fees, non-single meter utilities charges, and (some) late fees. *Id.* ¶ 22 n.1. Mr. Buhta states that the ledger attached to the eviction complaint against Ms. Heins showed that the redemption amount included charges that were not permitted by the order enforcing the settlement

agreement. *Id.* ¶ 26.[7] LRN does not agree that the Olmstead Court Order enforcing the settlement agreement prohibited MIMG from charging an application fee, credit approval fee, and administrative fee totaling $450. But there is no dispute that if MIMG had not allocated Ms. Heins' payments to cover those fees, and allowed those payments to be credited against her account, the stated arrearage in the eviction complaint would have been less than the $4,130.32.

Ultimately, Ms. Heins and MIMG reached a settlement. *Id.* ¶ 29; *Heins* Brine Decl. ¶ 25, Ex. D. With emergency financial assistance from Olmsted County, Ms. Heins agreed to pay just over $7,600 in exchange for dismissal of the eviction case. First Heins Decl. ¶ 15. Ms. Heins states that the settlement amount included at least $450 in charges prohibited by the Olmsted Court Order. *Id.* ¶ 15.

### *Procedural History*

In their respective complaints, Ms. Johnson, Mr. Prigge, and Ms. Heins assert that LRN's conduct in the state court eviction cases violated several provisions of the FDCPA—

---

[7] Ms. Heins asserts that "LRN admitted that the ledger it relied on in determining the alleged arrearage that it sought to collect from Ms. Heins included the $50 application fee, the $100 move-in admin fee, and the $300 credit approval fee," and points to the deposition testimony of LRN's 30(b)(6) representative, Mr. Hage. *Heins*, Dkt. 68 at 19 (citing *Heins*, Dkt. 69-5 ("*Heins* LRN Dep.") at 12–14). In reviewing this deposition testimony, the Court finds no admission by LRN that it sought to collect these fees through the eviction action.

15 U.S.C. §§ 1692e, 1692e(2), 1692e(3), 1692e(10), and 1692f(1).[8] After filing their complaints, the Plaintiffs moved for partial summary judgment on their § 1692f(1) claims, which the Court denied as premature. *Johnson*, Dkt. 65. At the same time, LRN moved for judgment on the pleadings in each case, arguing that it did not engage in any debt collection activity when it pursued the eviction actions against the Plaintiffs because it sought only to enforce a security interest. The Court denied LRN's motions in a written Order. *Johnson*, Dkt. 66.[9]

After the completion of discovery, the Plaintiffs and LRN stipulated to the dismissal of all claims raised under § 1692e(3) that there was a lack of meaningful attorney involvement in any of the eviction actions. *Johnson*, Dkt. 83; *Prigge*, Dkt. 77; *Heins*, Dkt. 71. Each Plaintiff now asserts claims under the following FDCPA provisions: § 1692e, § 1692e(2), § 1692e(10), and § 1692f(1). However, all of these claims arise out of the same operative facts—that the eviction complaints against each Plaintiff misrepresented how much each Plaintiff owed and attempted to collect amounts that were not authorized by the parties' agreements or were prohibited by law. In the pending summary-judgment motions,

---

[8] The complaints in each of these cases also assert that LRN's conduct violated 15 U.S.C. § 1692g, which requires debt collectors to make certain disclosures to a debtor in an initial debt-collection communication. *E.g.*, *Johnson*, Dkt. 1 ¶ 38. However, the facts alleged in the Plaintiffs' complaints do not plausibly allege any violation of this provision, and the Plaintiffs have not advanced any claim under it in the summary-judgment briefing. Therefore, the Court construes the Plaintiffs as abandoning any claim under § 1692g.

[9] Although the Court rejected LRN's argument and LRN does not raise the issue again in connection with its motions for summary judgment, LRN has indicated its intent to preserve the "debt-collector-versus-security-interest-enforcer" issue. *Johnson*, Dkt. 86 at 15 n.4; *Prigge*, Dkt. 86 at 13 n.5; *Heins*, Dkt. 74 at 13 n.4.

Plaintiffs argue that they are entitled to judgment on their § 1692f(1) claims and LRN seeks summary judgment on all claims asserted by each Plaintiffs. The Court heard oral argument on November 17, 2025.[10]

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Grp. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[10] LRN has also requested leave to amend its answers in each case. *Johnson*, Dkt. 67; *Prigge*, Dkt. 62; *Heins*, Dkt. 57. Magistrate Judge Elsa M. Bullard canceled the hearing on those motions pending the outcome of the summary-judgment motions and indicated she would reschedule the hearing if necessary. *Johnson*, Dkt. 90; *Prigge*, Dkt. 85; *Heins*, Dkt. 80. Because the Court grants LRN's motions for summary judgment and dismisses these cases with prejudice, LRN's motions to amend the answers are denied as moot.

party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

"When considering [Plaintiffs'] motion, the Court views the record in the light most favorable to the [LRN], and when considering [LRN's] motion, the court must view the record in the light most favorable to [the Plaintiffs]." *Durand v. Fairview Health Servs.*, 230 F. Supp. 3d 959, 965 (D. Minn. 2017). "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact[.]" *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). If the parties' motions "suggest[] that . . . conflicting inferences as to a material fact may reasonably be drawn from the materials before the court," summary judgment must be denied. *Id.*

## II.    The FDCPA

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). To achieve these purposes, the FDCPA "imposes civil liability on debt collectors for certain prohibited debt collection practices." *Smith v. Stewart, Zlimen & Jungers, Ltd.*, 990 F.3d

640, 644 (8th Cir. 2021) (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576 (2010)). "It broadly prohibits a debt collector from making a false, deceptive or misleading representation or means in connection with the collection of any debt, . . . and from using unfair or unconscionable means to collect or attempt to collect any debt[.]" *Haney v. Portfolio Recovery Assocs., LLC*, 895 F.3d 974, 981 (8th Cir. 2016) (quoting *Janson v. Katharyn B. Davis, LLC*, 806 F.3d 435, 437 (8th Cir. 2015) (quoting 15 U.S.C. §§ 1692e and 1692f)) (cleaned up). In addition, § 1692e and § 1692f, the provisions at issue in this case, contain "several specific examples of prohibited actions." *Id.*

In relevant part, Section 1692e provides:

> A debt collector may not use any false, deceptive or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (2) The false representation of—
>
> (A) the character, amount, or legal status of any debt
> . . . .
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692e(2), (10). Courts evaluate whether a communication is false, deceptive, or misleading by applying the "unsophisticated-consumer standard which is designed to protect consumers of below average sophistication or intelligence without having the standard tied to the very last rung on the sophistication ladder." *Eide v. Colltech, Inc.*, 987 F. Supp. 2d 951, 957 (D. Minn. 2013) (quoting *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004)). But to be actionable under § 1692e, a false statement

made by a debt collector must be material because "[a] statement cannot mislead unless it is material[.]" *Hill v. Accounts Receivable Servs., LLC*, 888 F.3d 343, 346 (8th Cir. 2018) (quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 758 (7th Cir. 2009)).

Section 1692f(1) states:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> > (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

15 U.S.C. § 1692f(1).

Establishing a defendant's liability under either § 1692e or § 1692f requires proof of the following three elements: "(1) the plaintiff has been the object of collection activity from a consumer debt; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Mayfield v. Portfolio Recovery Assocs., LLC*, 553 F. Supp. 3d 676, 684 (D. Minn. 2021) (quoting *Klein v. Stewart Zlimen & Jungers, Ltd.*, No. 18-cv-658 (JRT/ECW), 2019 WL 79317, at *3 (D. Minn. Jan. 2, 2019)) (brackets omitted from *Mayfield*). The focus at the summary judgment stage in these cases is on the final element—whether LRN engaged in conduct that is prohibited by §§ 1692e, 1692(e)(2), 1692(e)(10), or 1692f(1).

## III.    LRN's Motions

The Court turns first to LRN's motions and, because it is dispositive in each Plaintiff's case, its lead argument. LRN argues that Plaintiffs cannot prevail on any of their

claims because, under existing Eighth Circuit law, the FDCPA does not impose liability on a debt-collecting lawyer or law firm that takes a good-faith legal position supporting a request for relief to a court in a legal pleading. In support of this argument, LRN relies on a trio of Eighth Circuit cases that explored limits on FDCPA liability for debt-collection lawyers engaged in litigation—*Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814 (8th Cir. 2012); *Haney v. Portfolio Recovery Associates, LLC*, 895 F.3d 974 (8th Cir. 2016) (per curiam); and *Smith v. Stewart, Zlimen & Jungers, Ltd.*, 990 F.3d 640 (8th Cir. 2021). Based on these decisions (and other relevant precedent) and a careful review of the record in Ms. Johnson's, Mr. Prigge's, and Ms. Heins' cases, the Court concludes that LRN is entitled to summary judgment.

**A. Relevant Caselaw**

To understand *Hemmingsen*, *Haney*, and *Smith*, it is important to start with the history of the FDCPA's application to attorneys, and the Supreme Court's consideration of the interplay between the FDCPA's conduct-regulating provisions and the practice of law. Originally, the FDCPA, by its own terms, did not apply to lawyers collecting debts on behalf of their clients. *Hemmingsen*, 674 F.3d at 817 (explaining that "the FDCPA exempted any attorney-at-law collecting a debt in the name of a client from the statutory definition of debt collector") (cleaned up). However, "[i]n 1986, reacting to the explosion of law firms conducting debt collection businesses, Congress repealed the exemption." *Id.*

Of course, lawyers can collect and attempt to collect debts in different ways. For example, debt collection law firms may send letters to consumers, negotiate settlements, and take other, similar steps to attempt to collect debts. But they can also engage in debt

collection activities through the litigation process—filing and prosecuting collection actions on behalf of creditors. In *Heintz v. Jenkins*, 514 U.S. 291 (1995), the Supreme Court held that the FDCPA applies to a lawyer who regularly collects consumer debts through litigation. *Id.* at 299.

The *Heintz* Court observed that when Congress repealed the exemption it did not create a "narrower, litigation-related, exemption," 514 U.S. at 294–95, but the Court acknowledged that some of the FDCPA's conduct-regulating provisions could create unexpected results that might be inconsistent "with the statute's apparent objective of preserving creditors' judicial remedies," when applied to lawyers engaged in litigation, *id.* at 295–97. To that end, *Heintz* noted that courts may need to recognize "additional, implicit, exception[s]" for litigation conduct to the FDCPA's conduct-regulating provisions. *Id.* at 297; *Hemmingsen*, 674 F.3d at 818 (quoting *Jerman*, 599 U.S. at 600 ("those [conduct-regulating] provisions should not be assumed to compel absurd results when applied to debt collecting attorneys")). Building on this aspect of *Heintz*, in *Hemmingsen*, *Haney*, and *Smith*, the Eighth Circuit imposed certain limits on FDCPA liability for debt collection lawyers for their litigation-related conduct.

### *Hemmingsen v. Messerli & Kramer, P.A.*

The first of the trio of Eighth Circuit cases was *Hemmingsen*. There, the district court granted summary judgment to a debt collection law firm on Plaintiff Heather Hemmingsen's FDCPA claims arising out of the firm's litigation-related conduct. 674 F.3d at 816–17. Representing a creditor, the law firm sued Ms. Hemmingsen in state court, alleging that she was liable for a credit card debt. *Id.* at 816. Ms. Hemmingsen's ex-

husband, George, had opened the account and used it during their marriage, and the creditor hoped to collect from Ms. Hemmingsen as a jointly liable debtor. *Id.* During the litigation, the law firm filed a memorandum in support of its own summary judgment motion, as well as a supporting affidavit from its client, arguing that Ms. Hemmingsen should be held liable for the debt. *Id.* at 816. However, the state court rejected the law firm's argument, found Ms. Hemmingsen was not liable as a matter of law, and granted summary judgment in her favor. *Id.* at 816–17.

After she won in state court, Ms. Hemmingsen sued the law firm for violations of the FDCPA, asserting claims under both § 1692e and § 1692f. *Id.* at 817. The federal district court granted summary judgment to the defendant and Ms. Hemmingsen appealed. *Id.* at 815–16. With respect to the § 1692e claims, the *Hemmingsen* court declined to adopt a "broad ruling that false statements not made directly to a consumer debtor are never actionable under § 1692e." *Id.* at 818. But the court upheld the dismissal of the § 1692e claims because the law firm made the allegedly false and misleading statements in summary judgment pleadings "for the purpose of persuading the state court to grant relief." And none of the circumstances suggested the firm attempted to deceive Ms. Hemmingsen, her attorney, or the state court judge. *Id.* at 819. The *Hemmingsen* court also emphasized that the law firm's position in its state court summary judgment pleadings had ample factual support, despite being ultimately unsuccessful. *Id.*

*Hemmingsen* also affirmed the dismissal of Ms. Hemmingsen's § 1692f claim. The the court found the defendant "had more than enough basis in fact to defeat as a matter of law Ms. Hemmingsen's claims that [the firm] . . . used 'unfair or unconscionable means to

collect or attempt to collect any debt.'" *Id.* at 820 (quoting § 1692f). The state court's rejection of the firm's argument that Ms. Hemmingsen was legally responsible for George's debt did not demonstrate that the firm's "aggressive pursuit of [its client's] unpaid account in litigation violated statutory prohibitions targeted at abusive pre-litigation practices." *Id.*

Along the way to reaching these conclusions, the *Hemmingsen* court also described an "obvious example" of litigation-related conduct that "would raise far different issues of abusive, deceptive, or unfair means of debt collection." *Id.* at 818. The court posited a scenario in which a "defendant debt collector lawyer routinely files collection complaints containing intentionally false assertions of the amount owed, serves the complaints on unrepresented consumers, and then dismisses any complaint that is not defaulted . . . ." *Id.* In contrast to this hypothetical, the court observed that imposing liability under the circumstances presented by Ms. Hemmingsen's claims "would be contrary to the FDCPA's apparent objective of preserving creditors' judicial remedies" and emphasized the fact-finding role of the judicial process:

> If judicial proceedings are to accurately resolve factual disputes, a lawyer must be permitted to call witnesses without fear of being sued if the witness is disbelieved and it is alleged that the lawyer knew or should have known that the witness' testimony was false. Judges have ample power to award attorney's fees to a party injured by a lawyer's fraudulent or vexatious litigation tactics. There is no need for follow-on § 1692e litigation that increases the cost of resolving bona fide debtor-creditor disputes.

*Id.* at 819–20 (quotations and citations omitted).

### *Haney v. Portfolio Recovery Associations, LLC*

Next up is *Haney*. In relevant part, *Haney* addressed the actions taken by a debt collector and the law firm representing it in pursuit of collection actions in state court. In the "prayer for relief" in the state court complaints, the debt collector alleged that it was entitled to recover compound interest. 895 F.3d at 979 (describing the prayer for relief in the relevant state court complaints).

Mr. Haney sued the debt collector and the law firm in federal court, alleging that the recovery of compound interest was prohibited under state law, so the collection actions contained "a false representation [regarding the nature of the debt] and constituted an unfair or unconscionable means to collect a debt, in violation of §§ 1692e and 1692f(1)." *Id.* at 989. Although it concluded that the defendants could not collect the compound interest under applicable state law, the *Haney* court affirmed the dismissal of Haney's FDCPA claims because "the claim for that amount in the petition was a statement directed to the court, and it was a good faith legal position on a point of unsettled Missouri law." *Id.* The court found the alleged violations were "a far cry from the unfair and abusive scenario contemplated in *Hemmingsen*." *Id.* at 990.

### *Smith v. Stewart, Zlimen & Jungers, Ltd.*

The most recent of the trio of Eighth Circuit decisions is *Smith*. 990 F.3d at 640. There, a law firm filed collection actions in state conciliation court against Nicole Smith and JaRonda Washington, and in each case's complaint, the firm alleged that the consumers owed a sum of money "plus disbursements." *Id.* at 642–43. Both Smith and Washington prevailed in the state court collection actions because the law firm was unable to establish

a complete chain of assignment from the original creditor to its own client, *id.* at 643, which was necessary to comply with a standing order in the state court, *id.* at 646–47 (describing the standing order).

The plaintiffs then sued the law firm in federal court claiming that the firm violated § 1692e by falsely stating that they were liable for the disbursements because such sums are not collectable under state law. *Id.* at 643. The *Smith* court found that the plaintiffs failed to allege any facts showing that the request for disbursements was anything other than the law firm's "good faith legal position." *Id.* at 645 (rejecting the argument as placing "form over substance" that the request for disbursements did not appear in a prayer for relief as it had in *Haney*). The plaintiffs also raised § 1692f(1) claims, alleging that the firm engaged in unconscionable means to collect a debt by bringing the collection actions against them without sufficient evidence to establish a complete chain of assignment. *Id.* at 646–48. Again, the court concluded that the plaintiffs failed to state a claim, finding: (1) that they failed to plead facts showing that the firm attempted to collect any debt that was not owed; (2) even though the firm "failed to meet its evidentiary burden, . . . it was nevertheless entitled to bring a good faith claim to collect the alleged debts"; and (3) the plaintiffs failed to point to any facts suggesting that the firm had done anything other than file a good faith claim. *Id.* at 647–48.

### *Scope*

The parties dispute how *Hemmingsen*, *Haney*, and *Smith* should be understood. LRN takes the position that it is entitled to summary judgment because "no FDCPA liability attaches where, as here, a lawyer takes a good-faith legal position supporting a request for

relief to a court in a legal pleading." *E.g.*, *Prigge*, Dkt. 86 at 19 (cleaned up). Plaintiffs counter that these Eighth Circuit cases are much more limited in scope; that they do not countenance any exception to the strict liability imposed by the FDCPA; and that they are factually distinguishable. *E.g.*, *Prigge*, Dkt. 92 at 10–18.

Fully demarcating the limits the Eighth Circuit precedent places on FDCPA liability for attorneys' litigation-related conduct is beyond the scope of this Order. This area of the law continues to develop through a "case-by-case approach," *Hemmingsen*, 674 F.3d at 819, and the Eight Circuit has avoided making sweeping pronouncements.[11] Nevertheless, some guiding principles are evident and none of the cases in this area have been expressly limited to its own facts.

First, although Plaintiffs suggest that the caselaw does not reflect an exception to the FDCPA's strict liability framework at all, the Court disagrees. The relevant portions of *Hemmingsen*, *Haney*, and *Smith* take the strict liability otherwise imposed by the FDCPA's conduct-regulating provisions and carve out exceptions for debt collection attorneys who engage in certain litigation conduct in good faith. Indeed, the decisions flow directly from

---

[11] Other cases illustrate the case-by-case development of this area of law. *See Hill v. Accounts Receivable Servs., LLC*, 888 F.3d 343, 346–47 (8th Cir. 2018) (affirming dismissal of § 1692f(1) claim because the possible recovery of interest requested in pleadings was an unsettled issue of Minnesota law); *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685 (8th Cir. 2017) (reversing dismissal of FDCPA claims where law firm defendant had a routine practice of filing collection actions and setting them for trials with no intent of going to trial); *Kowouto v. Jellum Law, P.A.*, 750 F. Supp. 3d 973, 982–83 (D. Minn. 2024) (denying debt collection law firm's motion for summary judgment where the the firm filed many eviction complaints seeking *all* attorney fees incurred in connection with eviction actions, directly contravening a lease term limiting such recovery to $500).

the Supreme Court's assessment in *Heintz* that the law "contain[ed] some such *additional, implicit, exception*" in order to support "the statute's apparent objective of preserving creditors' judicial remedies." *Heintz*, 514 U.S. at 296–97 (emphasis added). The *Hemmingsen* court prefaced its entire discussion with precisely that observation. *Hemmingsen*, 674 F.3d at 818 (citing *Heintz*, 514 U.S. at 296–97).[12] There is no sensible way to understand the rules created by the *Hemmingsen*, *Haney*, and *Smith* trio of cases other than as defining an exception to FDCPA liability.

Next, Plaintiffs contend that because LRN stated what each of them owed in the body of the eviction complaints, rather than in the prayer for relief, their claims against LRN are not like those in *Haney* and *Smith*. But the mere fact that the alleged amount of unpaid rent in each eviction complaint does not appear in a prayer for relief is not controlling. *Smith* rejected a very similar argument as elevating "form over substance" and found that the defendant's requests for "disbursements" was "the equivalent of the prayer for relief in a typical district-court complaint." 990 F.3d at 645 (quotation omitted).

---

[12] Plaintiffs suggest that the only exception to strict liability in FDCPA cases is the bona fide error defense established under 15 U.S.C. § 1692k(c). *Johnson*, Dkt. 95 at 10 (arguing that any "good faith mistake" by LRN would be relevant only to damages or the affirmative defense of bona fide error). But that argument is difficult to reconcile with the Supreme Court's admonition that courts may need to recognize "additional, implicit, exception[s]" to the FDCPA's conduct-regulating provisions to achieve the goal of preserving legitimate creditors' remedies. *Hemmingsen*, 674 F.3d at 818 (quoting *Heintz*, 514 U.S. at 296–97); *id.* (quoting *Jerman*, 599 U.S. at 600 ("those [conduct-regulating] provisions should not be assumed to compel absurd results when applied to debt collecting attorneys")). Moreover, none of the three cases actually addresses the bona fide error defense.

Relatedly, Plaintiffs argue that because the only relief the landlord could obtain in an eviction action is a writ for possession of the premises, the alleged amounts were not statements directed to the court presiding over their eviction actions, but misrepresentations directed at the consumer concerning the amount of their debts. *E.g.*, *Prigge*, Dkt. 92 at 17. The Court is also not persuaded that the statements of the amount of unpaid rent in the eviction complaints are not actually communications directed to the state court, but are just aimed at the consumer. A statement of the amount of rent owed is required by Minnesota law to be included an eviction complaint, and its inclusion supports the position that the landlord is entitled to possession of the premises. Minn. Stat. § 504B.321, subd. 3(2) (requiring an eviction complaint based on "nonpayment of rent [to] attach a detailed, itemized accounting or statement listing the amounts").[13] While it is true that a landlord cannot obtain a court order in an eviction action requiring a tenant to pay rent, the landlord seeking to evict someone for failing to make payments under the lease cannot obtain the relief that is available to them without telling the state court how much the tenant owes.

Next, Plaintiffs argue that stating that a consumer or tenant owes more than they actually do is a categorically different FDCPA violation from the alleged violations in *Hemmingsen*, *Haney*, and *Smith*, so they should not control the outcomes here. For example, the defendant in *Hemmingsen* allegedly violated the FDCPA by stating a "legal

---

[13] The form eviction complaint in Minnesota requires the landlord to state the grounds for eviction, including the "total amount due" in cases of nonpayment of rent. Minnesota Judicial Branch, *Forms Packet: Eviction Complaint Packet*, https://mncourts.gov/_media/migration/courtforms/housing/hou102_current.pdf (last visited December 11, 2025).

position" in its memorandum and client affidavit that was false—that Ms. Hemmingsen was liable to its client for the credit card debt her husband amassed. In *Haney*, the defendant allegedly violated the FDCPA by asking for a particular form of relief in the collection action, and at that point, it was unsettled under state law whether that relief was available. And in *Smith*, the alleged violations included a request for a questionable form of relief (disbursements) and bringing the collection action without adequate evidentiary support needed to comply with a standing state court order. None of these concerned an alleged and simple misrepresentation of the amount owed, nor an allegation that the defendant attempted to collect amounts that were not owed under an agreement or that, by law, could not be recovered.

Stating in a legal pleading that a debtor owes $3,000 when she really owes something less is an assertion of fact and doesn't accurately convey the amount owed. And that isn't the same thing as a legal assertion that a debtor should be held liable as a joint user on an account or that the creditor is entitled to a certain kind of remedy, both of which concern the application of law to the facts.[14] *Hemmingsen*, *Haney*, and *Smith* treat the latter type of representations made in a pleading or other filing as the lawyer's statement of a "legal position." And reasonably understood, that trio of cases stands for the proposition that there is no FDCPA liability when an attorney, acting in good faith, sets forth such a "legal position" that the consumer should be held liable for the debt, or seeks relief that

---

[14] The distinction the Court draws here between "legal positions" and "facts" alleged in a pleading is less relevant to Ms. Heins's case, which alleges a violation of the FDCPA that resulted from LRN's interpretation of a separate court order.

can reasonably be requested under existing law. But the Court disagrees that this distinction makes the trio of cases inapposite. "Legal positions" aren't the only things needed in a pleading to convey to a court why the creditor in a debt collection action thinks it should prevail. The signing attorney includes both legal positions and the facts conveyed to her by her client. To include either in a pleading in Minnesota, she must conduct a reasonable inquiry under the circumstances, and failure to do that subjects the attorney to potential imposition of sanctions by the court. *See* Minn. R. Civ. P. 11.02(b), (c); Minn. R. Civ. P. 11.03. The fact that courts have such tools to address counsel's improper conduct certainly motivated the *Hemmingsen* court to conclude that there was no FDCPA violation there. 674 F.3d at 820 ("Judges have ample power to award attorney's fees to a party injured by a lawyer's fraudulent or vexatious litigation tactics. . . . There is no need for follow-on § 1692e litigation that increases the cost of resolving bona fide debtor-creditor disputes."). And the *Hemmingsen* court emphasized counsel's role in presenting the facts to the court. *Id.* at 819–20 ("If judicial proceedings are to accurately resolve factual disputes, a lawyer "must be permitted to call witnesses without fear of being sued if the witness is disbelieved and it is alleged that the lawyer knew or should have known that the witness' testimony was false.") (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439 (1976) (White, J., concurring)). In light of this reasoning, it is difficult to see why an attorney's good faith

should matter for FDCPA liability when it comes to assertions of legal positions in litigation, but not when it comes to the factual averments in a pleading.[15]

In sum, the Court finds the distinctions Plaintiffs have drawn between the alleged violations in the instant cases and the alleged violations in *Hemmingsen*, *Haney*, and *Smith* are not so significant that their reasoning cannot be applied here. The Court also observes that applying the rules from those cases to these circumstances does not leave a tenant without any remedy. Indeed, the record suggests that each of these Plaintiffs could have raised any of their concerns with the courts in the underlying eviction proceedings to address the merits of LRN's assertions, and if they believed LRN acted in bad faith, they could have sought corrective action in an appropriate motion. As explained above, a court in an underlying collection action can address sanctionable conduct if attorneys engage in vexatious litigation practices. If, for example, tenants believe that a law firm representing their landlords signed eviction complaints without an appropriate investigation of the facts or the law, or otherwise litigated in an unreasonable way, they can ask the court in the eviction action to address that conduct through an appropriate motion. Moreover, the exception at issue here applies only to *good faith* positions taken by counsel in debt-collection litigation. If there is evidence that calls into question whether an attorney's

---

[15] At least one other circuit court of appeals has focused on whether attorneys have an objectively reasonable basis for their assertions of both fact and law in debt collection litigation when considering liability under the FDCPA. *Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 896 (6th Cir. 2020) (drawing an analogy to Fed. R. Civ. P. 11 when considering assertions of fact under the FDCPA and finding that the "same logic applies" to both statements of fact and law); *see also Lee v. Javitch, Block & Rathbone LLP*, 601 F.3d 654, 658 (6th Cir. 2010) (focusing on the reasonableness of the attorney's investigation at the time the attorney made the factual assertion that allegedly violated the FDCPA).

assertion in litigation was made in good faith, the holdings of *Hemmingsen*, *Haney*, and *Smith* will not foreclose FDCPA liability as a matter of law. *See Kowouto*, 750 F. Supp. 3d at 982–83 (D. Minn. 2024) (finding a genuine fact dispute regarding the defendant's good faith where debt collection law firm sought recovery of all attorney's fees where a lease agreement clearly foreclosed that relief and had made the same misrepresentation in 30 other eviction actions).

### B.  Application to *Johnson*, *Prigge*, and *Heins*

Applying the law discussed above to Plaintiffs' cases, the Court finds that LRN is entitled to summary judgment in each. The record establishes that in alleging the amount owed in each case, LRN did nothing more than advance its clients' legal positions in good faith. Moreover, LRN's alleged violations of the FDCPA in all three cases are "a far cry" from the type of litigation conduct the Eighth Circuit has contemplated as forming the basis of a viable claim. *Haney*, 895 F.3d at 990.

#### *Heins*

Ms. Heins asserts that LRN violated the FDCPA when it filed an eviction complaint against her stating that she owed her landlord, MIMG, $4,130.32 in unpaid rent. She claims that LRN only arrived at that total because MIMG applied payments she made to certain fees that MIMG was enjoined from charging to Minnesota tenants under the Olmstead Court Order. According to Ms. Heins, the Olmstead Court Order required MIMG to apply her payments only toward her rental obligations, and had it done so, her debt to the landlord would have been several hundred dollars less than was stated in the eviction complaint. Because MIMG didn't credit the payments appropriately, she claims the eviction action

against her violated the Olmstead Court Order. Consequently, Ms. Heins claims that LRN misrepresented the amount of her debt in the eviction complaint in violation of §§ 1692e, 1692e(2)(A), 1692e(10), and attempted to collect amounts prohibited by law in violation of § 1692(f)(1).

However, the Court finds that the Olmstead Court Order's provisions enjoining certain eviction proceedings and requiring payments to be credited in specific ways did not plainly prevent LRN from pursuing the eviction action against Ms. Heins or from calculating the amount of unpaid rent the way it did. LRN, therefore, is entitled to summary judgment on Ms. Heins' FDCPA claims because LRN did nothing more than communicate its client's legal position in good faith based on assessment of an unsettled matter of state law. *See Smith*, 990 F.3d at 648; *Haney*, 895 F.3d at 989.

In relevant part, the Olmstead Court Order enjoined MIMG's conduct as follows: "For any past due account balance that accrues on or after May 1, 2022, MIMG shall not file an eviction action . . . against a Minnesota Tenant for failure to pay any amounts MIMG alleges are owed by the tenant except for" certain specified categories of charges, including "Base Rent," "Parking Fees," "Garage Fees," "Pet Fees," "Non-Single Meter Utilities Charges," and certain "Late Fees." *Heins* Buhta Decl., Ex. 3 at 6–8. In addition, the Order provides that "any payments made to MIMG by a Minnesota Tenant after May 1, 2022 will be first applied to the" identified permissible charges, and MIMG was required to "list any remaining amounts as a credit on the Minnesota Tenant's ledger, but shall not apply such credit to any amounts shown on a Minnesota Tenant's ledger." *Id.* at 8. Finally, the order

authorized eviction actions if a tenant failed "to pay amounts owing under the lease," such as unpaid rent. *Id.* at 9.

There is no dispute that LRN knew about the Olmsted Court Order enforcing the settlement agreement and took steps to ensure that any eviction complaints filed on behalf of MIMG complied with it. *Heins*, Dkt. 69-5 ("Hage Dep.") at 1 (explaining that only two attorneys handled MIMG cases and they were familiar with and understood the settlement agreement); *see also* DiMarco Decl. ¶ 25; Brine Dep. 14–20. The ledger for Ms. Heins' account with MIMG includes charges for a $50 application fee, a $100 move in admin fee, and a $300 credit approval fee. When MIMG retained LRN to pursue an eviction action against Ms. Heins, an LRN attorney reviewed the information provided by the landlord and concluded that the only unpaid charges forming the basis of the $4,130.32 debt reflected in the eviction complaint were unpaid rent. Hage Dep 12. In LRN's view, MIMG and Ms. Heins reached an agreement, before she became a tenant, pursuant to which she agreed to pay the application fee, the move-in admin fee, and the credit approval fee, and she was charged and paid those fees before the lease was signed. *Heins*, Newman Decl., Dkt. 75, Ex. B ("Brine Dep.") at 10. LRN explained that "[t]hose fees are application fees that are agreed upon by an applicant prior to entering into a lease. They're not part of this [order enforcing the settlement agreement]." *Id.* at 13; *Heins* Brine Decl. ¶¶ 19, 21. As a result, LRN concluded that MIMG could apply Ms. Heins's payments to the pre-tenancy fees, and then commence an eviction action for the full amount of unpaid rent without violating the Olmstead County Order.

On its face, the Olmstead Court Order does not directly address fees charged to *potential* tenants or applicants—it applies to Minnesota tenants. It is at least an open question whether MIMG was free to charge the fees at issue prior to the formation of a landlord-tenant relationship through execution of a lease. Even if LRN's interpretation of the Olmstead Court Order was ultimately incorrect, it was not unreasonable for LRN to draw the distinction it did and pursue the eviction action based on the balance of unpaid rent reflected in the ledger Ms. Brine received from MIMG. LRN provided unrebutted evidence that the credit application fee, move in admin fee, and application fee were paid pursuant to an agreement that pre-dated the formation of any landlord-tenant relationship between Ms. Heins and MIMG. As a result, even when viewed in the light most favorable to Ms. Heins, there is no evidence in the record suggesting that LRN did anything more than set forth its good faith legal position about the amount Ms. Heins owed, based on a reasonable understanding of the scope of the Olmstead Court Order.

LRN's assertion that Ms. Heins owed $4,130.32, therefore, resembles a debt collector's efforts "to collect interest whose availability was at the time legally uncertain." *Smith*, 990 F.3d at 648 (citing *Hill*, 888 F.3d at 346–47); *Haney*, 895 F.3d at 989 (affirming dismissal of FDCPA claims based on prayers for relief in collection action seeking to recover "disputed interest on interest" because it involved a "good faith legal position on a point of unsettled [state] law"). Moreover, there is no evidence indicating that LRN pursued the eviction action in bad faith. Accordingly, the Court finds that LRN is entitled to summary judgment on Ms. Heins' claims under §§ 1692e, 1692e(2)(A), 1692e(10), and 1692f(1).

***Prigge***

Mr. Prigge's § 1692e and § 1692f(1) claims stem from an alleged accounting flaw reflected in his landlord's account ledger. He asserts that his landlord imposed duplicate $187 charges that he had not agreed to pay, so his actual debt to his landlord was less than what LRN included in the eviction complaint. Because the eviction complaint incorporated those allegedly duplicate charges, Mr. Prigge claims that LRN misrepresented the amount of the debt, in violation of §§ 1692e, 1692e(2)(A), and 1692e(10), and attempted to collect amounts not owed under his lease, in violation of § 1692f(1). Here, even taking the reasonable inferences from the evidence in Mr. Prigge's favor, the Court finds that LRN is nonetheless entitled to summary judgment. The amount of debt alleged in the eviction complaint in Mr. Prigge's case constitutes LRN's good faith request for relief to a court, and LRN's allegation was reasonable given the factual support it received from its client. *See Hemmingsen*, 674 F.3d at 819–20.

LRN received a request from Mr. Prigge's landlord to file an eviction action against him and processed that request according to its ordinary intake procedures for eviction actions. Hage Decl. ¶ 24. LRN attorney Brian Hage reviewed the materials obtained from the client, including the detailed ledger for his account. *Id.* ¶ 25. The $187 charges at issue in May and June 2023 are coded as "Assisted rent (voucher)" and "Correction- Rent amount increased to $1,045.00." First Prigge Decl., Ex. B at 4. Although the evidence in the record does not clearly explain what the two $187 charges are actually for, there is no evidence indicating that LRN knew these charges were duplicative or reflected amounts Mr. Prigge had not agreed to pay. Hage Decl. ¶ 28. And there is no evidence indicating that

LRN had any reason to doubt that the information it received from the landlord, supported by the ledger, was accurate. Hage Decl. ¶¶ 28, 37–38.

This is not a case where LRN is accused of "routine" submission of complaints "containing intentionally false assertions of the amount owed," nor does this case bear any of the other hallmarks of the "obvious example" of litigation conduct that the *Hemmingsen* court found concerning. 674 F.3d at 818. There is no evidence that LRN acted in bad faith when it filed the eviction complaint or when Mr. Hage reviewed the information that LRN received from the landlord. At the time Mr. Hage prepared and filed the eviction complaint, the information conveyed by the landlord supported LRN's assertion in the complaint about the amount of the debt. And given the ledger's differing descriptions for the charges at issue, it was not objectively unreasonable for LRN to rely on the information its client provided when stating the amount of the debt in the eviction complaint. Mr. Prigge's § 1692e claims fail as a matter of law here because, even if he is correct that the ledger reflects duplicative charges, LRN's statement of the amount of the debt conveyed to the court its good faith legal position, based on the facts available, in support of the requested relief. *See id.* at 819 (finding "it was not false or misleading" for debt collection counsel to submit a summary judgment memo and client affidavit in underlying collection suit for which law firm had factual support). With respect to his § 1692f claim, the allegation that he owed $2,493.92 in unpaid rent and fees was sufficiently supported "to defeat as a matter of law [Mr. Prigge's] claims that [LRN] . . . used 'unfair or unconscionable means to collect or attempt to collect any debt[.]'" *Id.* at 820 (quoting § 1692f).

One of Mr. Prigge's remaining arguments merits further discussion. He asserts that there is no documentation in the record confirming a rent increase to $1,045, so when LRN filed the eviction complaint, it "relied without verification on information provided by its client." *Prigge*, Dkt. 74 at 16–17. LRN did not address this argument in its briefing and pointed to no documentation in the record confirming that rent increase. The Court's own review of the evidence did not reveal a new lease or a lease amendment reflecting the increase. The lease itself shows a monthly rent for the apartment of $920. *Prigge*, Dkt. 83-1 at 4; Hage Decl., Ex. C at 3–4.[16] However, Mr. Hage testified that he had received information from the client indicating that the monthly rent for Mr. Prigge's unit was $1,045. *Prigge*, Dkt. 89-1 (Hage Dep.) at 26–27. The record confirms that the landlord conveyed that information through LRN's intake software before Mr. Hage reviewed the file and prepared the eviction complaint. Hage Decl., Ex. B. at 2 (indicating that a representative of the landlord completed the prompt "Tenant Monthly Rent Changed: <b>TO<b> $1,045.00"). It would likely be a better practice for counsel to obtain lease documentation confirming the dollar figure for monthly rent that is conveyed by a client, but Mr. Prigge does not point to any evidence indicating that it was unreasonable for Mr. Hage to rely on the information conveyed by his client.[17] Nor is there any evidence

---

[16] After the eviction complaint was filed in Mr. Prigge's case, LRN attorney Clarice Scarnecchia sent an email to the landlord requesting documentation of a rent increase to $955. Hage Decl., Ex. F at 3. Where the $955 figure comes from is not apparent, but the Court finds this evidence to be immaterial to the outcome here.

[17] *See Miller v. Bittner*, 985 F.2d 935, 939–40 (8th Cir. 1993) (stating "[a]n attorney is [also] entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable" and finding no Rule 11 violation by plaintiff's law

showing that Mr. Hage or LRN knew it was false to allege a monthly rent of $1,045 at the time the eviction complaint was filed. *See Janson*, 806 F.3d at 437–38 (affirming dismissal of plaintiff's claim that landlord's law firm violated §§ 1692e and 1692f by filing an affidavit swearing to the truth of its contents without having personal knowledge of the facts in the affidavit concerning the amount of rent owed). Under these circumstances, a reasonable jury could not find that LRN failed to act in good faith.

For these reasons, the Court finds that LRN is entitled to summary judgment on Mr. Prigge's FDCPA claims.

### *Johnson*

The Court reaches the same conclusion with respect to Ms. Johnson's claims under the FDCPA. LRN is entitled to summary judgment on the §§ 1692e and 1692f claims because there is no evidence that LRN did anything more than communicate its good faith legal position to the state court regarding the amount Ms. Johnson owed her landlord, and LRN had factual support for its assertions even though it ultimately learned that the amount stated in the eviction complaint was incorrect.

When LRN filed the eviction complaint against Ms. Johnson in July 2023, it alleged that she owed her landlord $1,827. Not only did the amount include unpaid rent for May through July 2023, but it also included $587 in unpaid installments under the Repayment Agreement for May 2021 through October 2021. There is no dispute that Ms. Johnson did not owe that $587 because she had already fully paid off the Repayment Agreement. The

---

firm where the firm relied on their client's statements and "had no reason to question the representations" he made).

$587 ended up being included in the statement of the amount Ms. Johnson owed because her landlord improperly placed a second $796 charge on her account in December 2022. It is beyond debate that the eviction complaint said Ms. Johnson owed more than she did.

But when LRN filed the eviction complaint, it did not know about that erroneous second charge. After the landlord retained LRN for the eviction proceeding and provided information about the case to LRN through its software application, LRN attorney Bridget Brine reviewed that information, including the ledger for Ms. Johnson's tenancy. The landlord stated that Ms. Johnson had failed to repay all that she owed under the Repayment Agreement, and when Ms. Brine followed up for confirmation about that aspect of the debt, the landlord again confirmed that Ms. Johnson had failed to make the required payments. Even after Ms. Brine filed the eviction action against Ms. Johnson, Ms. Brine again confirmed with the landlord that Ms. Johnson had an outstanding balance. However, in August 2023, during the eviction proceedings, the landlord finally informed Ms. Brine that Ms. Johnson fully paid off the Repayment Agreement in April 2022.

This again is "a far cry" from the kind of circumstances the Eighth Circuit has indicated will support an FDCPA claim against counsel for conduct in litigation. *See Haney*, 895 F.3d at 990 (citing *Hemmingsen*, 674 F.3d at 818). There is no evidence suggesting that the eviction complaint here "contain[s] intentionally false assertions of the amount owed," *Hemmingsen*, 674 F.3d at 818, or LRN or Brine otherwise engaged in bad faith conduct. "It was not false or misleading to submit [the eviction complaint]" containing the erroneous statement of the amount of the debt when Ms. Brine had reviewed the information provided by her client and more than once confirmed the debt under the

Repayment Agreement. *Id.* at 819. The Court finds that Ms. Johnson's § 1692e, 1692e(2)(A), and 1692e(10) claims fail because the allegedly false and misleading statement of the amount owed in the eviction complaint was nothing more than LRN's communication of its good faith position to the state court, a good faith position supported by appropriate care and diligence. For the same reasons, LRN's "pleading[] had more than enough basis in fact to defeat as a matter of law [Ms. Johnson's] claims that [LRN] . . . used 'unfair or unconscionable means to collect or attempt to collect any debt[.]'." *Id.* at 820 (quoting § 1692f).

Accordingly, the Court grants LRN's motion for summary judgment in Ms. Johnson's case.

## IV.   Plaintiffs' Motions

Because the Court grants summary judgment in LRN's favor, Plaintiffs' motions for summary judgment in each of these cases are denied.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1. In *Johnson v. Landlord Resource Network*, No. 24-cv-2602 (KMM/EMB):

    a. Plaintiff's Motion for Partial Summary Judgment (Dkt. 78) is **DENIED**;

    b. Defendant's Motion for Summary Judgment (Dkt. 84) is **GRANTED**;

    c. Defendant's Motion to Enlarge Scheduling Order and for Leave to File an Amended Answer to Plaintiff's Complaint (Dkt. 67) is **DENIED AS MOOT**; and

    d. The action is **DISMISSED WITH PREJUDICE**.

        **Let Judgment be entered accordingly**.

2. In *Prigge v. Landlord Resource Network*, 24-cv-3328 (KMM/EMB):

    a. Plaintiff's Motion for Partial Summary Judgment (Dkt. 72) is **DENIED**;

    b. Defendant's Motion for Summary Judgment (Dkt. 78) is **GRANTED**;

    c. Defendant's Motion to Enlarge Scheduling Order and for Leave to File an Amended Answer to Plaintiff's Complaint (Dkt. 62) is **DENIED AS MOOT**; and

    d. The action is **DISMISSED WITH PREJUDICE**.

    **Let Judgment be entered accordingly**.

3. In *Heins v. Landlord Resource Network*, 24-cv-4105 (KMM/EMB)

    a. Motion for Partial Summary Judgment (Dkt. 66) is **DENIED**;

    b. Defendant's Motion for Summary Judgment (Dkt. 72) is **GRANTED**; and

    c. Defendant's Motion to Enlarge Scheduling Order and for Leave to File an Amended Answer to Plaintiff's Complaint (Dkt. 57) is **DENIED AS MOOT**; and

    d. The action is **DISMISSED WITH PREJUDICE**.

    **Let Judgment be entered accordingly**.


Date: December 19, 2025

                                            *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States District Judge